# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

HENRY WESTON,

               Plaintiff,

v.

ROBERT WEINMAN, MARY
MOORE, AIMEE WILSON, and
CRYSTAL MELI,

               Defendants.

Case No. 22-CV-507-JPS

**ORDER**

Plaintiff Henry Weston ("Plaintiff"), who is currently incarcerated at Waupun Correctional Institution ("WCI"), filed a pro se complaint under 42 U.S.C. § 1983 alleging that various defendants violated his constitutional rights. ECF No. 1. On January 31, 2023, the Court screened the complaint and allowed Plaintiff to proceed on an Eighth Amendment claim for deliberate indifference to his serious medical needs against Defendants Mary Moore ("Moore"), Crystal Meli ("Meli"), Robert Weinman ("Weinman"), and Aimee Marshall ("Marshall").[1] ECF No. 7 at 8.

Now pending before the Court is Defendants' motion for summary judgment, filed on December 4, 2023, ECF No. 20. On January 8, 2024, Plaintiff filed a motion for an extension of time and to use his prisoner release account to file the opposition. ECF No. 30. Thereafter, Plaintiff filed his opposition on March 14, 2024. ECF No. 31. The Court will accordingly deny Plaintiff's motion for an extension of time and to use his release

---

[1]Defendant Aimee Marshall was formerly known as Aimee Wilson. ECF No. 22 at 2). As such, the remainder of this Order will refer to her only as "Marshall."

account as moot. On March 28, 2024, Defendants filed a reply brief. ECF No. 33. As described below, the Court will grant Defendants' motion for summary judgment and this case will be dismissed with prejudice.

## 1.     LEGAL STANDARD – SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

## 2.     FACTUAL BACKGROUND

In compliance with the Court's order, Defendants submitted a stipulated set of joint facts, ECF No. 23, and a set of genuinely disputed facts, ECF No. 24. Defendants also submitted proposed findings of fact, many of which Plaintiff purportedly disputes.[2] Plaintiff submitted a

_____

[2] Defendants' proposed findings of fact do not follow the Court's summary judgment protocols regarding factual submissions. *See* ECF No. 15 at 2–3. However, a significant number of Plaintiff's purported 'disputes' fail to properly address Defendants' assertions of fact as required by Federal Rule of Civil Procedure 56(c). Given this, the Court will treat these facts as undisputed for the

response to Defendants' proposed findings of fact. ECF No. 32. The Court has carefully reviewed all factual submissions and the Court finds the following facts, except where explicitly noted, to be undisputed. Although Plaintiff attempts to dispute a large number the proposed facts, he fails to properly address Defendants' assertions as required by Federal Rule of Civil Procedure 56(c).[3] As a result, the Court has treated these facts as undisputed for the purposes of summary judgment. *See* Fed. R. Civ. P. 56(e)(2). Thus, the following facts are taken directly from Defendants' proposed findings of fact with only minor edits for grammar and formatting.

## 2.1 Party Roles

Plaintiff was allowed to proceed on Eighth Amendment deliberate indifference claims against the Defendants for allegations that they denied him adequate medical treatment for his chronic back pain from November

---

purposes of summary judgment. *See* Fed. R. Civ. P. 56(e)(2). The Court understands Defendants' need for their submission; however, in the future Defendants must seek leave of the Court prior to straying from the summary judgment protocols.

[3]The Court provides the following example of Plaintiff's purported disputes:

Defendants' Fact: "An NP works under the general supervision of the Medical Director and in collaboration with the institution physician to provide medical services to inmates in the institution's Health Services Unit (HSU), including patient evaluation, assessment, and treatment."

Plaintiff's Response: "Okay. So I dispute it, but at the same time, I object for the reason being is that -- let me see. Moore stated in her interrogatory no physical exam was done -- no physical exam was done that day, and for her to state that an AP works under the general supervision – let me see where I'm at. All right. So when she's saying including patient evaluations, assessments and treatment, that's the part I disagree with, so – It would be the last part, including patient evaluation, assessment and treatment -- Moore Declaration Paragraph 6."

2019 through September 2021, which resulted in ongoing and unnecessary pain in his lower back. Plaintiff is an inmate confined within the Wisconsin Department of Corrections and incarcerated at WCI. Moore was the Advanced Practice Nurse Prescriber ("NP") at WCI from July 8, 2019 through April 8, 2022. Weinman was a Weekend Nurse Clinician 2 at WCI from February 19, 2018 through July 18, 2020. He was employed as the Nursing Supervisor ("HSM") at WCI from January 31, 2021 through November 19, 2022. Meli was the HSM at WCI from December 11, 2016 to September 25, 2020. Marshall was the Food Service Administrator at WCI from April 17, 2016 through April 10, 2021. She was also the Americans with Disabilities Act ("ADA") Coordinator at WCI during this timeframe.

An NP works under the general supervision of the Medical Director and in collaboration with the institution physician to provide medical services to inmates in the institution's Health Services Unit ("HSU"), including patient evaluation, assessment, and treatment. NPs have the authority to make diagnoses and prescribe medications; the institution physician has the overall responsibility for clinical judgments regarding health care in the unit. NPs do not set the schedule for seeing inmate patients. Inmates are prioritized for appointments by the nursing staff based on their professional judgment for when an inmate patient should see an advanced care provider ("ACP") and the Medical Program Assistant Associate ("MPAA") schedules the appointments. NPs are authorized to order offsite appointments for inmates.

A Nurse Clinician 2 works under the general supervision of the Nursing Supervisor. A Nurse Clinician 2's responsibilities include, but are not limited to, providing skilled nursing care to incarcerated adults in the state correctional facilities. This included both ambulatory and infirmary

settings. The nursing duties included patient assessment and treatment, assisting the physician in providing medical services, management of medications, provision of emergency care and maintenance of medical records. Nurse Clinicians 2 do not diagnose, determine a course of treatment for, or prescribe medications for an inmate patient. Nor can a Nurse Clinician 2 override the treatment decisions of an advanced care provider. This position does not have control over the schedules of the Department of Corrections' physicians, dentist, or outside specialists.

The HSM provides the overall administrative support and direction of the Health Services unit. The HSM does not have any direct patient care contact with the inmate patients. The HSM does not have the authority to prescribe medication (other than over-the-counter drugs), refer patients to offsite specialists, order imaging studies, or override the treatment decision of the dentist, physicians, nurse practitioners, and/or physician assistants.

The ADA Coordinator is an individual identified by the institution to receive and process requests for accommodation from inmates. The ADA Coordinator collaborates with the HSU to determine if an inmate is eligible for a requested accommodation. In addition, the ADA Coordinator consults with other areas of the facility including, but not limited to: education, maintenance, Psychological Services Unit ("PSU"), and security to ensure the most appropriate accommodation would not pose a threat to the safety and security of other individuals or the facility. Sometimes, if the request would not fall under ADA accommodation requirements, the ADA Coordinator refers the requester to seek their needs through other means approved by the DOC. The ADA Coordinator is an administrative role and does not provide medical care or treatment to inmates. Thus, the ADA

Coordinator is not required to hold any form of medical licensure, nor does the ADA Coordinator engage in/participate in the medical care of inmates.

### 2.2    Weinman's Involvement in Plaintiff's Claims

When inmates enter WCI, they are given an inmate handbook informing them how to file inmate complaints. The purpose of the inmate complaint process is to provide inmates with the ability to raise issues or concerns they may experience within an institutional setting and allows for those concerns to be investigated and decided upon expeditiously. Each accepted inmate complaint is assigned a number and an institution complaint examiner ("ICE") to investigate the claims of the complaint. For complaints regarding health care, the assigned ICE may request assistance from the Health Services Unit staff in acquiring information regarding the inmate's care and addressing the claim raised.

As the HSM at WCI between January 31, 2021 through November 19, 2022, Defendant Weinman was contacted by the ICE to provide input regarding one inmate complaint that is relevant to this lawsuit. On September 23, 2021, the ICE's office received and acknowledged inmate complaint WCI-2021-14514, where Plaintiff complained that he was being denied medical care for his lower back which was causing him chronic pain. The ICE contacted Weinman to discuss this complaint. Weinman informed the ICE that Plaintiff's complaints were addressed, he had been triaged by a nurse and was on the list to see a provider.

On November 11, 2019, Plaintiff's blood sample was collected by WCI nursing staff Weinman. As a Nurse Clinician 2 at WCI between February 19, 2018 through July 18, 2020, the only involvement Weinman had with Plaintiff's medical care was collecting and documenting this blood test. This was the extent of Weinman's care of Plaintiff while he was a

Weekend Nurse Clinician 2 at WCI. Weinman did not provide any direct care to Plaintiff during his role as the HSM at WCI.

### 2.3 Meli's Involvement in Plaintiff's Claims

As the HSM at WCI between December 11, 2016 to September 25, 2020, Meli was contacted by the ICE to provide input regarding one inmate complaint that is relevant to this lawsuit. On April 16, 2020, the ICE's office received and acknowledged inmate complaint WCI-2020-6579, where Plaintiff complained that HSU medical staff failed to provide him the necessary medication for his nerve pain, and he was prescribed an inappropriate medication. The ICE contacted Meli to discuss the matter. Meli informed the ICE that Plaintiff was prescribed desipramine per his provider, and he was scheduled to see his provider.

Meli did not provide any direct medical care to Plaintiff during her role as the HSM at WCI. As the HSM, Meli and Weinman could not override the treatment and medication decisions of Plaintiff's primary care provider.

When inmates enter WCI, they are given an inmate handbook informing them how to access medical and dental care. Inmates are also informed that if they need to see medical staff immediately (emergency type situations), they should alert unit staff of their problem or concern. When an inmate has a medical concern, wishes to communicate with medical staff, and/or requests to be seen by HSU staff, he fills out a HSR form and submits it to the HSU. The HSRs are triaged by the nursing staff once daily. The registered nurse uses their nursing training and judgment when triaging the HSRs and prioritizing appointments and inmate needs. Once the HSR has been responded to, it is placed in the inmate's personal request folder portion of the medical record. A response will indicate whether the inmate is scheduled to be seen, whether the HSR is referred to

another staff member, or referred for copies or a record review, or whether education materials are attached. The responder may also include written comments. Even though an HSR may be directed to the HSM, HSRs are always triaged in the same manner for patient care and safety. The HSRs directed to HSMs would first be reviewed by HSU staff. If the nurse who triages the HSR identified the issue as emergent, he or she would alert staff or see the patient for an assessment. When the request is determined by the medical staff to be urgent or emergent in nature, arrangements will be made for a same day appointment for evaluation with a health care provider.

Meli responded to three HSRs/Information Requests from Plaintiff during the relevant timeframe of this lawsuit (November 2019 – September 2021). Two were relevant to the claims at issue in this case. When nursing staff forwarded Meli Plaintiff's Health Service Requests/Information Requests, she responded with information from his medical chart, and when needed, she entered an order for Plaintiff to see a provider to address the medical concerns he raised in his inmate complaint.[4]

### 2.4 Marshall's Involvement in Plaintiff's Claims

An inmate may request a reasonable accommodation by written request to the ADA Coordinator by submitting a DOC-2530 – Reasonable Modification/Accommodation Request. A reasonable accommodation includes, but is not limited to, adjustments, adaptations, or modifications to facilities or operations within a facility, or the use of modified or auxiliary aids that enable a qualified person with a disability equal access, participation, and benefits of programs services and activities. Such

---

[4] The parties dispute whether Meli "timely" responded to Plaintiff's request. ECF No. 22 at 18. The Court will address this dispute in its analysis below.

accommodation shall not impose undue hardship on the DOC nor compromise the safety or security of staff, inmates, public or any facility. ADA accommodations are separate from Special Needs Committee ("SNC") accommodations.

The SNC is a facility multidisciplinary committee that reviews requests for special needs/restrictions/adaptations. The SNC determines the necessity for medically based accommodations and the committee consists of medical personnel. The SNC is able to facilitate needs that are specific to an illness that does not need additional consideration based on the security of the institution or modifications that require the assistance of outside agencies or contractors to complete such as: Extra Blankets, extra pillows, medical ice, medical shoes, etc. The SNC may correspond with HSU staff to determine if the accommodation the inmate is requesting is appropriate and medically necessary given their disability, diagnosis, or special need.

Typically, the inmate must have a documented, reasonable, medical need for the requested accommodation. If the inmate does not have a documented medical reason as to why they need such an accommodation, the SNC may deny the request.

The ADA Committee is responsible for accommodations which require the assistance of DOC departments, outside agencies or contractors such as handrails, interpreters, magnifying glasses for reading, etc. Marshall reviewed one ADA accommodation request by Plaintiff which he submitted on January 25, 2021. He requested the following accommodations: Back brace, lower bunk restriction, medical ice, and red tag.

A "red tag" restriction is a single cell accommodation. He explained the reasoning for these requests was because he was limited in his ability to

bend over or to stand up straight all the way. He noted he had sharp pain in his lower back and legs. Plaintiff's request for a red tag, back brace, lower bunk, and medical ice were not considered ADA accommodations.

The medical reasons for granting a single cell accommodation are fairly limited, including being pregnant, having a communicable disease, and having major medical equipment that requires a lot of space. Defendants claim that Plaintiff did not have any medical disability or condition that would warrant having a single cell. However, Marshall attempted to determine if Plaintiff had a documented disability that would qualify him for the accommodations he was requesting or if his accommodations were being handled by another facility within the institution so she could provide Plaintiff with information on his requests or instruction on how to move forward with his request via the appropriate channel.

On February 5, 2021, Defendant Marshall returned Plaintiff's ADA accommodation request to HSU informing him that he should refer his request to the SNC. This was the extent of Marshall's involvement in Plaintiff' medical care at WCI. She received and processed Plaintiff's January 2021 ADA accommodation request and determined his requests were not within the scope of the ADA and referred him to the SNC. She was not a part of the SNC committee when they made the decision to approve his requests for a low bunk and medical ice and deny his request for a single cell and back brace. Marshall did not provide any direct medical care or treatment to the inmates at WCI, including Plaintiff.

### 2.5 Treatment of Plaintiff's Chronic Low Back Pain

As the NP at WCI from July 8, 2019 through April 8, 2022, Moore was Plaintiff's primary care physician. Prior to NP Moore's care of Plaintiff, he

had been diagnosed with acute back pain with sciatica and prescribed 600 mg of gabapentin three times a day (morning, noon, and bedtime) for his complaints of chronic back pain.

In March of 2020, due to the COVID-19 pandemic, WCI facility operations were not running at normal capacity. Onsite and offsite medical appointments were kept to an absolute minimum with only emergent situations or conditions which required immediate attention being attended to at a normal frequency. Those inmates with chronic conditions who did not have emergency needs were treated with prescribed medications or other self-administered interventions (ice, wraps, TENS Unit, etc.) but face to face appointments with medical staff were limited to avoid the risk of spreading the virus throughout the institution.

The DOC formulary, which is a list of prescription and nonprescription medications that are ordinarily available to authorized prescribers working for DOC, is developed, reviewed, and updated by the Pharmacy and Therapeutics Committee. Advanced Care Providers ("ACPs") utilize the formulary when writing prescriptions for inmates. However, when a drug is not listed on the formulary, the ACP must submit a request for non-formulary drug approval. Depending on the medication requested, non-formulary requests are reviewed on a case-by-case basis by either the Psychiatry Director, the Medical Director, or an Associate Medical Director. An ACP may consider prescribing a non-formulary medication when alternative formulary medications have been proven to not be effective or are contraindicated. ACPs must request approval prior to prescribing a non-formulary medication.

Gabapentin is a non-formulary medication that is used to treat seizures, an FDA approved use, and sometimes nerve pain, a non-FDA

approved, or "off-label" use. Gabapentin is sometimes intended to be prescribed for neuropathic pain (or pain due to nerve damage). Testing, such as an EMG, is used to determine whether a patient has neuropathy (nerve damage). Gabapentin is problematic in a correctional setting because it has the potential for abuse and diversion. Inmates will often snort gabapentin to get a high similar to valium, sometimes in conjunction with other drugs. These behaviors can lead to health, safety, and security risks. This is sometimes done by the inmate with the prescription; however, it is also common for inmates to sell or be extorted for their gabapentin prescriptions.

In 2020, the Wisconsin DOC required a special form for gabapentin and Lyrica (pregabalin) approval because of these issues. To be able to write a prescription for gabapentin, a provider was required to submit this form and have it approved by the Medical Director or designee (usually an Assistant Medical Director). The criteria for an approved prescription of gabapentin within DOC includes: the failure of first- line treatments (Tylenol, NSAIDs, Amitriptyline and Duloxetine); proven neuropathy by EMG (if applicable); and no history of medication diversion. To protect an inmate and the rest of the inmate population from possible gabapentin abuse, or to protect the patient from being extorted for their prescription, gabapentin is considered a "last resort" medication and should only be prescribed when everything else has been tried and failed. ACPs also should treat these concerns with other nonmedication based therapies.

Recently, gabapentin has been designated by the Wisconsin Controlled Substances Board as a prescription drug having a substantial potential for misuse and is now tracked by the Wisconsin Prescription Drug Monitoring Program ("PDMP"). In 2020, the PDMP, included gabapentin

and Lyrica in its rules to track its prescribing, as previously was the case for narcotics. As of 2021, gabapentin was the highest prescribed drug, accounting for 15% of the medications monitored by PDMP. Inmates who are prescribed gabapentin are subjected to random blood tests to ensure they are not misusing or diverting the medication.

On November 4, 2019, Moore received an automated notification that Plaintiff's gabapentin prescription was due to expire. That day, she renewed his gabapentin prescription and blood test to verify the level of gabapentin in Plaintiff's blood supply. On November 11, 2019, Plaintiff's blood sample was collected, and the blood test revealed that the level of gabapentin in his blood supply was undetectable—Plaintiff's blood levels showed gabapentin at <0.5, and the therapeutic range for gabapentin is 2.0-20.0. (67.) Anything less that 0.5 is considered undetectable. According to Plaintiff's medication administration records, he had taken almost every dose of gabapentin he was offered, except for two refused doses on November 3, 2019 and November 4, 2019. However, there were no other documented missed or refused doses of gabapentin near the blood test date that would explain why the level of gabapentin in Plaintiff's blood levels was undetectable on the test. The average amount of time it takes for the gabapentin to become detectible in the blood is one week. If Plaintiff was actually taking his gabapentin as the MAR describes, his blood level would have been detectable. That Plaintiff's blood level of gabapentin was undetectable, and he had not missed or refused any doses of gabapentin indicated to NP Moore that he was diverting/misusing his medication by not taking it as prescribed.

On November 14, 2019, NP Moore wrote Plaintiff a letter and informed him that his recent gabapentin blood level was undetectable and

therefore it had been discontinued. Moore informed Plaintiff that an alternate pain medication would be provided to him. On November 27, 2019, Moore ordered Plaintiff 25mg of desipramine once a day to replace his gabapentin prescription. Desipramine is a tricyclic antidepressant that works by increasing the activity of a chemical called norepinephrine in the brain. Desipramine is used primarily to treat depression but has been found to be an effective treatment for chronic neuropathic pain due to nerve damage in low doses. Moore decided to prescribe Plaintiff desipramine because it reports fewer side effects than other classifications of medications such as SSRIs or SNRIs. Additionally, desipramine has less potential for addiction than gabapentin and is not a medication which is known to be abused in the prison setting. For Plaintiff, desipramine was an appropriate alternative medication to address his symptoms.

Between December 2, 2019 (the day his medication was scheduled to be switched from gabapentin to desipramine) and March 18, 2020, Plaintiff's medication administration records showed he refused to accept his prescribed desipramine medication 56 times. On March 16, 2020, Plaintiff wrote a HSR with a complaint that the desipramine dosage he was prescribed was not helping him. On March 18, 2020, Moore responded directly to Plaintiff in writing and informed him that his dosage would be increased to twice daily. Although his medication administration record showed he had not been properly taking the medication for it to be effective, Moore decided to increase his dosage because doing so could have increased his compliance and allowed the medication to potentially prove effective for him.

Between March 18, 2020 and April 6, 2020, Plaintiff's medication administration records showed he refused to accept his prescribed

desipramine medication 15 times. On April 6, 2020, at his request, Moore increased Plaintiff's dosage of desipramine to a 50mg dosage two times a day. Between April 6, 2020 and May 6, 2020, Plaintiff's medication administration records showed he refused to accept his prescribed desipramine medication 46 times.

On April 19, 2020, Plaintiff informed Moore that he was still experiencing chronic lower back pain and that his prescribed desipramine was not helping. He requested his medication be changed. Moore responded to Plaintiff that he was not taking his medication and informed him he needed to take the medication twice a day every day for at least two to three weeks before concluding that it was ineffective. She further instructed him to contact her again after he had followed this directive if the medication was still proving to be ineffective.

On May 6, 2020, Moore saw Plaintiff for a follow up appointment regarding his complaints of low back pain as ordered by HSM Meli on April 16, 2020. Plaintiff reported during the appointment that his current dose of desipramine was not working. When meeting with a patient in person, Moore cannot readily review the medication administration record ("MAR") and therefore take patients at their word. So, in response, Moore increased his desipramine dosage to 100mg twice a day and prescribed him 100mg of Celebrex to be taken twice a day on May 6, 2020. Celebrex is a nonsteroidal anti-inflammatory drug ("NSAID"), specifically a COX-2 inhibitor, which relieves pain and swelling. Moore added this to Plaintiff's prescribed medications as a "Keep on Person", meaning he could retain the medication in his cell and take it as needed in an effort to treat his complaints of chronic pain. Moore prescribed both desipramine and Celebrex in tandem because Plaintiff was continuing to refuse to take the

desipramine and complain that the medication was not working. Having both medications available to him was an effort to control his pain regardless of which medication he was taking. Because he was not having any adverse side effects from the desipramine, Moore kept him on that medication to observe the effectiveness of the medication if he took it as prescribed. The Celebrex was accessible to Plaintiff as needed, so that would help alleviate the pain he was experiencing if he continued to refuse the desipramine. Both medications work in different ways to treat the symptoms that Plaintiff was reporting, and there was no risk associated with him taking both at the same time.

Between May 6, 2020 and September 21, 2020, Plaintiff's medication administration records showed he refused to accept his prescribed desipramine medication 175 times. On August 17, 2020, Plaintiff again complained that the desipramine was not working and NP Moore again responded that the medicine would not be effective if he continued to refuse to take it. On September 14, 2020, Plaintiff again complained that the desipramine he was prescribed was ineffective. Moore informed Plaintiff that the desipramine would be discontinued and the Celebrex prescription would be increased to 200mg to be taken twice a day. Moore could not evaluate the effectiveness of Plaintiff's prescribed dose of desipramine because of his continued refusal to take the medication as directed. Anti-depressants need to be taken regularly and then still take time to build up in the system to start having an effect on chronic pain. Despite numerous increases to the dosage of the medication in response to Plaintiff's complaints and continuous communications with Plaintiff himself informing him that the medication was ineffective because he was refusing

to take it, Moore discontinued the medication because continuing to prescribe it to him without him taking it was futile.

In October of 2020, Plaintiff submitted several requests complaining that he was suffering from his lumbar disc displacement and was experiencing pain, inquired about his disability status and special needs accommodations, and alleged he had no pain medications. All requests were acknowledged and responded to. Moore informed Plaintiff that he was prescribed both Celebrex and Tylenol for pain. Plaintiff was not diagnosed with lumbar disc displacement at the time of these requests.

Because of Plaintiff's continued complaints of chronic pain, on October 28, 2020, Moore ordered an MRI of Plaintiff's lower back to revisit his need for accommodations and his overall treatment plan. As the APNP at WCI, Moore was authorized to order offsite appointments, but she was not the scheduler. She did not contact the offsite facilities directly and schedule the inmate for their consultation/treatment, nor was she able to determine the availability of offsite providers. Moore does not have control over the scheduling or availability of services with off-site providers. Moreover, at the time, there were longer delays in scheduling off-site testing and procedures due to ongoing closures, shortages, and the high demands on hospitals from the COVID-19 pandemic. Moore did not know when Plaintiff was scheduled to have the MRI conducted. However, Plaintiff's condition was not emergent. Additionally, Plaintiff continued to receive prescribed pain medications during this time. Also, in response to his continued complaints, November 9, 2020, NP Moore ordered Plaintiff 500mg of salsalate "KOP" to be taken two times a day. Salsalate is another nonsteroidal anti-inflammatory drug ("NSAID"), used to relieve pain from various conditions.

On February 4, 2021, NP Moore saw Plaintiff for an appointment regarding his low back pain with left sciatica. During that appointment he informed her he had sustained an initial injury in 2005 while he was playing basketball and had a previous MRI in 2014 which showed he had lumbar disc displacement and annulus tear. NP Moore conducted a physical examination of Plaintiff's back and did not document anything abnormal. However, she increased his salsalate prescription to 1000 mg two times a day due to his self-report of continued pain. NP Moore also referred Plaintiff to physical therapy which he was willing to try. And she ordered him a TENS Unit and ordered a follow-up after his MRI results were back. Chronic pain management often requires multiple trials and error to find an effective medication. Chronic pain medication options include anti-seizure medications, tricyclic antidepressants, SSIs, SNRIs, and anti-inflammatories. Responsible medical staff generally start with low dosages and increase depending on patient reports and tolerance. All of these classes of medication were trialed with Plaintiff. In response, NP Moore discontinued the salsalate prescription and prescribed Plaintiff lidocaine cream and naproxen. Lidocaine cream is a local anesthetic used on the skin, which works by stopping nerves from sending pain signals to the brain.

On March 22, 2021, Plaintiff had an MRI of his lower back which found a stable (as compared to the 2014 MRI) disc bulge at L5-S1 which impinges bilateral S1 nerve roots at the lateral recesses. Plaintiff's diagnosis from the MRI was lumbar degenerative disc disease. That same day, Defendant Moore scheduled a follow-up appointment with the physician at WCI to review the results of the MRI with Plaintiff. Despite the delay in receiving the MRI of his lower back in March 2021, the results did not indicate that the delay exacerbated or worsened Plaintiff's condition. The

Case 2:22-cv-00507-JPS   Filed 06/14/24   Page 18 of 34   Document 35

results displayed a stable, chronic condition that had remained virtually unchanged from his initial MRI that was conducted in 2014.

On April 2, 2021, during his appointment with Dr. Cheryl Jeanpierre, DO, Plaintiff was prescribed 30mg of Duloxetine to be taken once per day for his chronic back pain. Duloxetine is a selective serotonin and norepinephrine reuptake inhibitor ("SSNRI") used as an antidepressant and nerve pain medication. Studies have shown that when compared with gabapentin, duloxetine is as effective in treating peripheral neuropathy (chronic nerve pain) but has fewer side effects and significantly higher safety. Between April 7, 2021 and September 1, 2021, Plaintiff's medication administration records showed he refused to accept his prescribed Duloxetine medication 100 times.

Since September 2021, Plaintiff has continued to be prescribed medications to help treat his complaints of back pain, including, including Duloxetine, naproxen, carbamazepine, acetaminophen, and diclofenac topical. Between November 2019 and September 2021, Plaintiff was prescribed a total of 7 different medications, including gabapentin, desipramine, Celebrex, Duloxetine, salsalate, lidocaine topical, and naproxen. However, the effectiveness of Plaintiff's prescribed medications could not be evaluated because of his continued refusal to take the medications as directed. Despite this, Moore and other medical staff continued to address his repeated complaints of lower back pain by prescribing him different forms of medication, increasing the dosage of those medications, and prescribing medications as "Keep on Person" medications so Plaintiff had the ability to self-medicate when he experienced pain. When Plaintiff would communicate with HSU staff about the ineffectiveness of his medications, his requests were responded to

timely and appropriately by HSU staff, including NP Moore. He was informed of his noncompliance with his prescribed medications, but different medications or dosages were still offered to address his concerns. Moore ended her tenure as the APNP at WCI in April 2022 and therefore did not treat Plaintiff after that date.

### 2.6 Plaintiff's Special Needs Request

On January 17, 2020, Plaintiff requested a low bunk restriction be placed for him. Plaintiff's request was forwarded to the SNC. As the APNP at WCI, Moore was required to be a member of the SNC and participated in committee decisions for approving or denying requests based on her medical expertise and the inmate's medical records. Typically, the inmate must have a documented, reasonable, medical need for the requested accommodation. If the inmate does not have a documented medical reason as to why they need such an accommodation, the SNC may deny the request.

The SNC reviewed Plaintiff's January 17, 2020 request for a low-bunk restriction on January 23, 2020. Plaintiff did not have any documented medical condition beyond his complaints of low back pain that would establish a need for a low bunk at that time. Although he had back pain, he did not have significant functional limitations associated with the pain. Plaintiff's documented "acute back pain with sciatica" was from November of 2018, and thus was no longer considered acute but a chronic condition.[5] The SNC came to a unanimous conclusion that Plaintiff's request for a low

---

[5]The parties dispute whether Plaintiff's condition qualifies as a disability; however, this dispute is immaterial for the purposes of the Eighth Amendment claim at issue.

Case 2:22-cv-00507-JPS    Filed 06/14/24    Page 20 of 34    Document 35

bunk be denied as the request did not meet the criteria as defined in the policy.

On October 29, 2020, the SNC reviewed another special needs request from Plaintiff requesting a low bunk and medical ice. For the same reasons as the first request, the SNC again denied his requests because his condition did not meet the criteria outlined in the policy. Further, medical ice was generally reserved for inmates with acute injuries, not chronic conditions. On January 25, 2021, Plaintiff submitted a Reasonable Modification/Accommodation Request to the ADA Coordinator requesting a red tag (single cell requirement), low-bunk restriction, back brace, and medical ice. Marshall forwarded his request to the SNC as the accommodations Plaintiff had requested were properly addressed by the SNC. The SNC reviewed Plaintiff's accommodation requests. Plaintiff's request for a back brace was denied because generally a physical therapist needed to recommend this type of medical device.

His request for a single cell was also denied, as he did not have any documented medical need for a single cell. Single cells are generally reserved for inmates with more advanced medical conditions. This can include inmates who utilize wheelchairs, those with infectious diseases, or inmates who have an established vulnerability due to their psychiatric condition. Back pain is not a viable reason for a single cell. His requests for a low bunk and medical ice were approved because of his continued complaints of low back pain and his reported difficulty standing up straight and bending over due to the pain he was experiencing. These documented functional limitations qualified him for a low-bunk restriction. Additionally, because he had an MRI scheduled for the next month to determine if his reports of back pain had a diagnosable condition, the low

bunk and medical ice created a temporary treatment plan until the MRI results were received. In November and December 2021, Plaintiff requested additional accommodations for his low back pain. He requested again a low bunk restriction, a back brace, and a red tag. Again, Plaintiff's request for a back brace and red tag were denied because his condition did not qualify him for those accommodations. However, his request for a low-bunk restriction was approved.[6]

3.     **ANALYSIS**

Defendants brought a motion for summary judgment seeking dismissal of the Eighth Amendment claim for deliberate inference to a serious medical need. ECF No. 20. Much of Plaintiff's opposition argument is that he was not reasonably accommodated for his disability and the parties dispute whether Plaintiff's condition qualified as a disability. *See* ECF No. 24 at 1; ECF No. 31. However, Plaintiff was only allowed to proceed on an Eighth Amendment claim and Plaintiff never sought reconsideration of the Court's screening order or leave to file an amended complaint to pursue an ADA claim. Summary judgment is not the appropriate time to address new claims, and the Court therefore focuses only on the Eighth Amendment deliberate indifference claim at issue. Based on the Court's review of the parties' submissions, and for the reasons explained below, the Court will grant Defendants' motion for summary judgment and will dismiss this case.

---

[6]The Court does not include Defendants' 'summary' section since it does not find repetition of these facts to be necessary.

### 3.1 Eighth Amendment Standard

To prove that Defendants violated his rights under the Eighth Amendment, Plaintiff must present evidence establishing that he suffered from "'an objectively serious medical condition'" and that Defendants were "'deliberately, that is subjectively, indifferent'" to that condition. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)). A prison official shows deliberate indifference when he or she "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

"'A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.'" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)). A broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit. *Id.* at 861 (citing *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (collecting cases)). On the other hand, a prison medical staff "that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue—the sorts of ailments for which many people who are not in prison do not seek medical attention—does not by its refusal violate the Constitution." *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (1997) (quoting *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)).

Under the Eighth Amendment, an incarcerated person does not have the right to direct his own course of treatment. *See Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015). Likewise, an incarcerated person's disagreement "about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)). But neither may prison officials "doggedly persist[ ] in a course of treatment known to be ineffective." *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005). To defeat Defendants' motion for summary judgment, Plaintiff must present evidence showing the treatment he received was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Id.* at 654 (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (citing *Zaya v. Sood*, 836 F.3d 800, 805-806 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did[.]" *Id.* (quoting *Petties v.*

*Carter*, 836 F.3d 722, 731 (7th Cir. 2016)) (alterations in original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment where the treatment is known to be ineffective but is chosen anyway. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

Finally, "[a] delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)). The length of delay that is tolerable "'depends on the seriousness of the condition and the ease of providing treatment.'" *Id.* (quoting *McGowan*, 612 F.3d at 640). To prevail on an Eighth Amendment claim alleging a delay in providing treatment, the plaintiff "must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties*, 836 F.3d at 730–31. Such evidence may include a showing in the plaintiff's medical records that "the patient repeatedly complained of enduring pain with no modifications in care." *Id.* at 731; *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007).

### 3.2    Defendant Moore

First, Moore does not argue that Plaintiff did not have an objectively serious medical need. ECF No. 21. As such, for the purposes of this Order the Court will assume, without definitively ruling, that Plaintiff suffered from an objectively serious medical condition and satisfies the first prong of the deliberate indifference standard.

Second, assuming Plaintiff suffered a serious medical condition, the Court finds that no reasonable juror could find that Moore was deliberately indifferent to Plaintiff's need for treatment. The undisputed facts show that

Case 2:22-cv-00507-JPS    Filed 06/14/24    Page 25 of 34    Document 35

Moore treated Plaintiff over an approximately twenty-month period for his back pain. The medical treatment that Plaintiff received during that time was not the treatment that Plaintiff wanted or subjectively believed he needed, but that fact alone is insufficient to establish deliberate indifference.

The Court begins with the well-established rule that when considering claims of deliberate indifference, the Court must give deference to a medical professional's judgment regarding treatment decisions. "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood,* 512 F.3d 886, 894–95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County,* 163 F.3d 982, 988 (7th Cir. 1998)). Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation. *Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006). Federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment. *Roe,* 631 F.3d at 857; *Sain,* 512 F.3d at 895. "But deference does *not* mean that a defendant automatically escapes liability any time he invokes professional judgment as the basis for a treatment decision." "When the plaintiff provides evidence from which a reasonable jury could conclude that the defendant didn't *honestly* believe his proffered medical explanation, summary judgment is unwarranted." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) (emphasis in original).

Based on the undisputed facts, the Court finds that a reasonable jury could not find that Moore was deliberately indifferent to Plaintiff's serious back pain. Moore was Plaintiff's primary care provider from July 8, 2019 through April 8, 2022, and the record is replete with Moore's attempts to treat Plaintiff's pain. Although Plaintiff disagreed with the treatment he received and its effectiveness, this is insufficient to meet the high burden of deliberate indifference. Plaintiff has provided no evidence to show that no minimally competent professional would have so responded under those circumstances.'" *See Sain*, 512 F.3d at 894–95. While the Court will not reiterate every interaction Moore had with Plaintiff during the relevant time period, the following summary addresses the main issues and Plaintiff's arguments.

Prior to Moore's care of Plaintiff, Plaintiff had been diagnosed with acute back pain with sciatica and prescribed 600 mg of gabapentin three times a day. On November 14, 2019, Moore discontinued the gabapentin and provided alternative pain medication based on a blood test result that led her to believe Plaintiff was diverting or misusing the medication. Instead, Moore prescribed 25 mg of desipramine once a day to replace the gabapentin because it had fewer side effects and less potential for addiction. Plaintiff disputes that he was abusing the gabapentin, and the Court accepts Plaintiff's version of the facts for the purpose of summary judgment. However, this fact is immaterial to the issue at hand because Plaintiff does not genuinely dispute the blood test results and its significance. Although Moore could have mistakenly thought that Plaintiff was abusing the gabapentin, no facts suggest that her decision to discontinue the medication was a significant departure from accepted professional standards or practices.

Case 2:22-cv-00507-JPS   Filed 06/14/24   Page 27 of 34   Document 35

During the remainer of Moore's treatment to Plaintiff, she increased his desipramine dosage and also prescribed five additional mediations (Celebrex, Duloxetine, salsalate, lidocaine topical, and naproxen). Plaintiff maintains that Moore's course of pain medication treatment was ineffective. However, "the Eighth Amendment does not entitle incarcerated patients to their preferred pain medication, nor does it impose the unrealistic requirement that doctors keep patients completely pain-free." *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 681 (7th Cir. 2023) (citation omitted). As the Seventh Circuit has articulated, "[t]here are many reasons for doctors to tread carefully when prescribing strong pain medications." *Id.* Plaintiff has not shown any facts to suggest that Moore "persisted in a course of treatment known to be ineffective." *See Machicote v. Roethlisberger*, 969 F.3d 822, 828 (7th Cir. 2020). Instead, the Court finds the record shows the opposite, as Moore repeatedly altered Plaintiff's treatment in response to his complaints of pain. Additionally, Moore's treatment was further hindered by the fact that Plaintiff refused to take his desipramine as prescribed. Despite Moore's instruction that the medicine would not be effective if he continued to refuse to take it, Plaintiff repeatedly refused his desipramine during the course of Moore's treatment to Plaintiff. As such, the Court does not find that Moore's pain medication decisions rose to the level of deliberate indifference.

Next, the Court addresses Plaintiff's delay in receiving the MRI for his back pain. Moore ordered an MRI of Plaintiff's lower back on October 28, 2020. Moore was not responsible for scheduling the MRI and had no control over the scheduling and availability of the off-site provider. Plaintiff did not receive an MRI until March 2021. Plaintiff maintains that this delay was unreasonable and caused him additional pain. The Court begins by

acknowledging the fact that October 2020 was in the midst of the COVID-19 pandemic and there were longer delays in scheduling off-site testing and procedures due to ongoing closures, shortages, and the high demands on hospitals from the pandemic. However, even if the Court assumes that the delay Plaintiff experienced was unreasonable and could be attributed to Moore's actions or lack thereof, Plaintiff has failed to provide "independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *See Petties,* 836 F.3d at 730–31. Moore continued to treat Plaintiff and adjust his treatment in the months prior to receiving the MRI. The results of the MRI revealed a stable, chronic condition that remained virtually unchanged since his initial MRI in 2014. As such, the Court finds that no reasonable jury could find that Moore was deliberately indifferent to Plaintiff regarding the timing of his MRI.

Next, the Court addresses Moore's failure to initially physically examine Plaintiff. Plaintiff maintains that Moore's failure to do so worsened his condition and amounted to Moore's deliberate indifference to his back pain. In this regard, Plaintiff again fails to show that Moore's decision not to initially physically examine him rose to the level of something more than negligence or even malpractice. *See Pyles,* 771 F.3d at 409. Prior to Moore treating Plaintiff, a different medical professional had diagnosed Plaintiff with acute back pain with sciatica and prescribed pain medication. Moore continued to treat Plaintiff for the same issue and adjusted his medication and treatments based on her professional judgment. Plaintiff has provided no evidence to show that any competent medical professional would regularly perform a physical examination of a patient in Plaintiff's circumstances. As such, Plaintiff cannot show that Moore's medical

decision regarding a physical examination of Plaintiff rose to the level of deliberate indifference.

Finally, the Court addresses Moore's involvement in Plaintiff's special needs requests. Moore was required to participate as a member of the SNC for approving or denying Plaintiff's requests based on her medical expertise. Moore participated in initial decisions to deny Plaintiff's requests for the medical accommodations of a single cell, low-bunk restriction, a back brace, and medical ice. Moore later participated in the January 2021 decisions to approve Plaintiff's request for medical ice and a low-bunk restriction. The record reflects that the approvals were granted at this juncture based on Plaintiff's continued complaints of low back pain and his reported difficulty standing up straight and bending over due to his pain. Plaintiff maintains that Moore's actions in this regard were inappropriate again because of her failure to physically examine him prior to making the decision. However, nothing in the record shows that Moore's SNC decisions, whether correct or not, rose to anything more than negligence. Nothing in the record reflects that no competent medical professional would not have made such decisions regarding Plaintiff's requests. As such, the Court cannot find Moore's deliberate indifference on this basis.

In sum, the record before the Court is full of Moore's attempts to treat Plaintiff's back pain. Perhaps, Plaintiff should have received different pain medication or other forms of treatment sooner. However, Plaintiff has offered no evidence calling into question Moore's exercise of professional judgment in treating Plaintiff. Plaintiff may have disagreed with Moore's course of treatment, but Plaintiff's subjective believe is insufficient to prove deliberate indifference. *Johnson*, 433 F.3d at 1013. The question before the Court is not whether this was the right course of treatment, and, indeed, the

Court does not have the answer to that question because it has no medical expertise. Instead, the question is whether Moore's treatment rose to the level of deliberate indifference. Based on the record before it, the Court finds that no reasonable juror could find Moore acted with deliberate indifference to Plaintiff's medical needs. As such, the Court will accordingly grant Defendants' summary judgment motion as to Moore.

### 3.3 Defendants Weinman, Meli, and Marshall

Again, given Defendants' lack of opposition on this issue, the Court will assume, without definitively ruling, that Plaintiff suffered from an objectively serious medical condition and satisfies the first prong of the deliberate indifference standard. Second, assuming Plaintiff suffered a serious medical condition, the Court again finds that no reasonable juror could find that Weinman, Meli, or Marshall were deliberately indifferent to Plaintiff's need for treatment based on the undisputed facts. The Court addresses these three defendants together given their limited interactions with Plaintiff's medical care.

As to Marshall, the undisputed facts show that she did not provide any direct medical care or treatment to Plaintiff. Plaintiff argues that Marshall incorrectly processed his accommodation requests; however, this fact, whether true or not, does not suggest that Marshall was deliberately indifferent to Plaintiff's medical need. Plaintiff's requests were reviewed by the SNC, including Moore as his medical provider; Marshall did not participate in any of the SNC decisions to deny his requests. As such, the Court finds that no reasonable juror could find that Marshall was deliberately indifferent to Plaintiff's serious medical needs.

Weinman and Meli's interaction with Plaintiff's medical care was similarly limited. Weinman and Meli were separately contacted by the ICE

regarding Plaintiff's inmate complaints WCI-2020-6579 and WCI-2021-1451. Additionally, Meli responded to three health service requests from Plaintiff for treatment.[7] Plaintiff disputes that Meli timely responded to his requests; however, even so, Plaintiff has shown no "independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *See Petties*, 836 F.3d at 730–31. It is undisputed that Weinman and Meli did not provide any direct care to Plaintiff during their time as the HSM and that they could not override treatment and medication decisions of Plaintiff's primary care provider in this role. Moreover, as the Court concluded above, Plaintiff received ongoing medical treatment and Moore's treatment decisions did not rise to the level of deliberate indifference. As such, even assuming Meli and Weinman could have overridden Moore's decisions, their deference to Moore's decisions would similarly not amount to deliberate indifference. Nothing in the record suggests that no competent medical professional would have responded to Plaintiff or to the ICE as Meli and Weinman did. As such, the Court finds that no reasonable jury could find that Marshall, Weinman, and Meli were deliberately indifferent to Plaintiff's serious medical needs. Thus, the Court will accordingly grant their motion for summary judgment.

### 4. CONCLUSION

For the reasons explained above, the Court denies as moot Plaintiff's motion for an extension of time and to use his prisoner release account. The

---

[7]The Court acknowledges that Weinman also collected and documented Plaintiff's blood test on November 11, 2019, while working as a Weekend Nurse Clinician 2. ECF No. 22 at 13. However, nothing in the record suggests that Weinman mishandled the blood test and Plaintiff does not make any argument in this regard.

Court also grants Defendants' motion for summary judgment in full and will accordingly dismiss this action with prejudice. Finally, the Court will deny Plaintiff's second motion for the appointment of counsel, ECF No. 16, as moot. The Court previously provided a full analysis of its decision to deny Plaintiff's first motion to appoint counsel, *see* ECF No. 14, and Plaintiff's second motion did not provide any information to change that prior determination regarding counsel. The Court has carefully reviewed the record and finds that Defendants are entitled to judgment as a matter of law.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for an extension of time and to use prisoner release account, ECF No. 30, and motion to appoint counsel, ECF No. 16, be and the same are hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment, ECF No. 20, be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 14th day of June, 2024.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge

This Order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **thirty (30)** days of the entry of judgment. See Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **twenty-eight (28)** days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline *See id.* A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.